CUTRER, Judge.
Humble Oil and Refining Company filed suit against the Collector of Revenue of the State of Louisiana for the refund of gas severance taxes paid under protest. From a judgment ordering the defendant to pay Humble $292,029.00 plus two per cent interest from October 13, 1970, the State files this suspensive appeal.
We affirm.
Humble, as a producer of oil and gas, alleges that the Collector of Revenue erred in disallowing gas severance tax exemption claims on gas produced in several fields operated by Humble in the State of Louisiana. Humble’s exemption claims pertain to gas used or disposed of in three different ways, “flash” gas, “gas lift” gas and gas used in the operation of Humble’s oil and gas wells.
Humble’s claims for tax exemption on these three categories of gas are as follows :
1. “Flash" gas $ 63,306.12
2. “Gas lift" gas 67,727.25
3. Gas used in the operation of Humble's oil and gas wells 113,766.49
4. Interest 47,229.14 Total $292,029.00
The Collector concedes that the judgment of the lower court is correct insofar as it orders payment of the exemption claims for the “flash” gas and “gas lift” gas.
The only remaining issue concerns the trial court’s award of Humble’s claim for exemption on gas used in its operation of oil and gas wells.
The assignment of errors is as follows:
“(1) The Trial Judge erred in holding the gas used as fuel was identifiable by quantity as having been produced in a particular field.
“(2) The Trial Judge erred in awarding-judgment in favor of Humble for the amount of severance tax paid on the gas allegedly used as fuel.”
The facts of the case are not in dispute. Humble is the operator of several oil and gas fields in Louisiana, five of which are involved in the issue before this court. The gas producing fields involved herein are Duck Lake, Garden City, Bayou Sale, Bayou Carlin and Lake Sand.
As gas is produced in each field it is first fed into a gas gathering system within such field. The field gathering system flows into a primary high pressure separator which removes liquid substances from the gas. As the gas leaves the separator it flows through a meter for measuring. It is then fed into a high pressure gas gathering system. The liquids from the high pressure separator is transferred to a low pressure separator. This latter separator liberates any low pressure gas and flows it through a measuring meter into a low pressure gathering system. This low pressure (50 to 250 psi) gas is fed through a compressor to bring the pressure up to that of the high pressure system (approximately 1200 psi). When the low pressure gas is compressed to 1200 psi it is fed into the high pressure gathering system. This high pressure system then flows into a dehydrator to remove any water present in the gas. As the gas leaves the dehydrator, it then flows into a master meter, which meter measures the total volume of gas produced by that particular field. This, in general, is the system used for gathering, separation, dehydration, measuring and monitoring gas in each of the five fields in question.
At this point in the process, the gas contains no liquid substances but does contain *679 gaseous substances which may be further processed and reduced to liquid form. The gaseous substances which may be liquefied are ethylene, propane, butane and natural gasoline. To liquefy these substances, a special intricate process is required. For practical as well as economical reasons a central plant was installed in the general area of the five fields for this purpose. The plant is known as the Garden City gas plant.
The gas from each field is transferred into a gas plant gathering system which transports the gas to the Garden City plant for processing. After processing, the gas is ready to be sold to Humble’s gas customers and/or to be transported back to the fields for fuel or gas lift purposes. As the gas leaves the plant, it is then known as “residue” gas. • Approximately 95 per cent of the gas is sold to customers and 5 per cent is transported back to the fields for fuel and gas lift purposes. The residue gas used for fuel or gas lift purposes is returned to the five fields in a system known as the “residue gas line”. As the gas leaves the residue gas line to enter each field, it is measured by a master meter. It then goes into each field to be used for fuel, gas lift and other production op-. erations. The gas is further measured by meters as it goes into each of these fuel and production operations. We have detailed this process to reflect that the trial court, in its well written reasons, correctly concluded as follows:
“It is important to note that at each point or phase in the entire operation there is located a meter which measures the imput or output, as the case may be, of the gas flowing through that particular line. As such there is little doubt that the system reflects accurately the quantities of product being produced from the field and the amount of fuel being returned.”
The Collector does not question the accuracy of Humble’s measuring system. It is the contention of the Collector that, accuracy notwithstanding, the exemption provisions of LSA-R.S. 47:633(9) (d) are not met by Humble due to the fact that the gas from the various fields are commingled in the processing plant and the gas which is returned to each field for fuel and gas lift use cannot be identified as the same or identical gas which was produced in that particular field. The trial court rejected the Collector’s literal application of this statute. We agree with the trial court’s conclusion under the facts and circumstances of this case.
LSA-R.S. 47:633(9)(d) provides as follows :
“(9) . . .
“The tax shall not accrue on the severance of gas:
sfc j{c # afc ‡ #
“(d) Used for drilling fuel in the field where produced (emphasis added) (whether used as drilling fuel by the producer of the gas, by the operator of a lease, or by another person) and gas used by the operator as described in R.S. 47:636 on leases operated by such operator for fuel in connection with the operation and development for or production of oil and gas in the field where produced. Gas used for fuel by an operator shall include gas used for heating, separating, producing, dehydrating, compressing and pumping of oil and gas in the field where the gas is produced. Gas used for drilling fuel in the field where the gas is produced shall include gas used by the operator or by any other person engaged in drilling in the field where the gas is produced.”
A search of the jurisprudence reveals only one case wherein the effect of commingling was considered in an oil and gas problem. In the case of Russell v. Producers’ Oil Co., 146 La. 481, 83 So. 773 (1920), a claim was made for oil royalties *680 due from the production of a well. The oil from this well was commingled with oil from other wells. The Supreme Court made the following observation :
“It being now impossible to ascertain exactly what proportion of the commingled oil came from plaintiffs’ well, plaintiffs invoke the principle that, ‘where goods are wrongfully commingled, the wrongdoer will lose his interest therein, unless he can identify the goods,’ and they claim the entirety of the commingled oil.
“This principle is, we think, inapplicable to the case; for there was no intention on the part of defendant to do wrong, but only to operate as economically as possible, and a record was kept of the group of wells from which came the oil of each delivery into the pipe line, and the daily output of each well is known approximately, so that full justice may be done to plaintiffs by letting them have the approximate output of their well plus a margin of safety.”
That case did not involve the interpretation of the tax exemption statute but does exemplify the Supreme Court’s attitude toward the contention that the act of commingling of production should, per se, justify the imposition of a penalty against the producer.
LSA-R.S. 47:633(9)(d) limits the tax exemption to gas used for fuel or production purposes in the field where produced. (Emphasis added.) The effect of this limitation is that, to be exempt from tax, gas used for fuel or production purposes in a field cannot exceed the total gas production of that field. If a field does not produce enough gas to meet its requirements for fuel or production purposes, and it is necessary to transfer gas from another field to supply the deficiency, the gas so transferred from the other field would be taxable.
The Collector, in his answer to the request for admission of facts stated as follows:
“It is also admitted that after processing, quantities of this commingled processed gas were returned to fields for use as drilling fuel or for fuel in connection with the operation and development for or the production of oil and gas. It is further admitted that during the period mentioned the total volume of commingled gas returned to each of Humble’s fields from the plant did not exceed the original total volumes of gas produced from such field during the month.’’ (Emphasis added.)
The gas returned to each field was not necessarily the identical gas which left the field for processing but such returned gas was identifiable as being a measured quantity which did not exceed the total field production during any one month. This identification, resulting from the sophisticated monitoring system provided by Humble, achieves the objects and purposes of the tax statute in question.
The Collector further contends that the exemption should be disallowed because the tax rate is different on gas produced from a “capable” well as distinguished from gas produced from an “incapable” well. An “incapable” well is one that is incapable of producing 250,000 cubic feet of gas per day during a month. A “capable” well is one which is capable of gas production in excess of that amount. He contends that these two categories of gas returned to a field cannot be identified. Gas produced from a “capable” well is taxed at the rate of 2.30 M.C.F. whereas gas produced from an “incapable” well is taxed at the rate of 1.30 M.C.F. This contention is without merit for two reasons.
First, the Collector admits in his answer that he has been allowing Humble an exemption on a portion of the gas returned *681 and used in each field by applying a formula wherein the exempt gas is the ratio that the gas, produced and sent from each field to the plant, bears to the total gas sent to the plant from all five fields. In his application of this formula during the tax period in question, he has been faced with the problem of allocation of the differential between the 1.30 and 2.30 gas.
Secondly, the Department of Conservation in its Statewide Order No. 29-B, Section XI — Production, Production Records, Production Tests, Paragraph D, (Exhibit P-2), makes the following requirement of all producers including Humble:
“D. 1. Every producer shall make and report to the District Managers production tests of each of his oil wells by the 15th of each month. The data collected shall include the daily rate of production, size choke, % B.S. & W., tubing pressure, casing pressure, gravity at 60° Fahrenheit, or observed gravity and temperature, gas/oil ratio and volume of gas produced, which shall be recorded on the daily gauge report on or before the above date. A signed record of such test shall be filed with the District Manager.” (Emphasis added.)
With such detail production records available on each well, it could easily be ascertained which well is “capable” and which would be “incapable” and the amount of gas produced from each. It would then be only a matter of administrative procedure to compute the proper allocation of gas taxable at the rate of 1.30 and that taxable at 2.30 in each field.
The interpretation of the statute herein will protect the public fisc and at the same time allow progress in the processing of our depleting oil and gas resources. We agree that the trial court was correct when it allowed the full claim by Humble.
For the above and foregoing reasons, the judgment of the District Court is affirmed.
Affirmed.